IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : : |
|                 Plaintiff, | :   Civil Action No. |
|       v. | : : |
| | :   1:12-CV-02922-AT |
| ERIC M. MARTIN, | : : |
|              Defendant, | : : |
|      and | : : |
| ROBIN A. MARTIN, | : : |
|            Relief Defendant | : : |

## SECOND AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), hereby

files this Amended Complaint alleging the following:

### Overview

1.    This case involves incidents of insider trading by Defendant Eric M. Martin

("Martin"), the Director and, later, Vice-President of Investor Relations at Carter's

Inc. ("Carter's" or the "Company")(NYSE: CRI), an Atlanta-based public issuer



and manufacturer of children's clothing.  Martin's position gave him extensive access to the Company's confidential financial and other material nonpublic information, including advance knowledge of, among other things, quarterly earnings.

2.      From at least January 2005 through March 2009, while employed at Carter's, Martin repeatedly traded Carter's stock while in possession of material nonpublic information and in advance of quarterly earnings announcements, and tipped others who traded, including a former research Analyst.

3.      Martin executed his illegal trades while he and other Carter's employees were subject to well-established blackout periods and preclearance procedures on trading in Carter's securities.  He took measures to hide his trades by, among other things, failing to obtain the required preclearance of his trades.

4.      After leaving Carter's in March 2009, Martin continued insider trading, receiving tips from a Carter's insider.  Martin not only traded for his own benefit with that information, but tipped others, including his consulting clients.  Martin's tippees made profits and avoided losses by trading while in possession of the information Martin received from a Carter's insider.

5.      Martin's illegal trading and tipping based on material nonpublic information generated millions of dollars in profits and losses avoided.

6.     Defendant has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act")[15 U.S.C. § 77a(q)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Jurisdiction and Venue

7.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1] to enjoin Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this amended complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

8.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

9.     Defendant, directly and indirectly, made use of the mails and the means and instrumentalities of interstate commerce in connection with the transactions, acts,

practices, and courses of business alleged in this amended complaint.

10.     Certain of the transactions, acts, practices, and courses of business

constituting violations of the Securities Act and the Exchange Act occurred in the

Northern District of Georgia.  Defendant and Relief Defendant reside in the

Northern District of Georgia.

11.     Defendant, unless restrained and enjoined by this Court, will continue to

engage in the transactions, acts, practices, and courses of business alleged in this

amended complaint, and in transactions, acts, practices, and courses of business of

similar purport and object.

### The Defendant

12.     <u>Eric M. Martin</u>, 42, resides in Roswell, Georgia.  From March 5, 2003, until

his termination on March 24, 2009, Martin served Carter's as its Director and later,

Vice President, of Investor Relations.  Upon leaving Carter's he became a

consultant.

### The Relief Defendant

13.     <u>Robin A. Martin</u>, 44, resides in Roswell, Georgia.  She is Martin's wife and

a homemaker.

### Relevant Entity

14.     <u>Carter's, Inc.</u>, an Atlanta-based public issuer, manufactures and markets in

the U.S. apparel exclusively for babies and young children.  The Company sells

clothing under the Carter's and OshKosh brand names as well as private label

apparel through its own stores and other retailers.  Since October 2003, Carter's

common stock has been registered with the Commission under Section 12(b) of the

Exchange Act and listed on the NYSE under the symbol "CRI."

**Martin's Access to Material
Nonpublic Information**

15.    Between 2003 and 2009, Martin served Carter's as its Director of Investor

Relations and Vice-President of Investor Relations.  Martin reported directly to

Carter's Chief Financial Officer (the "CFO").

16.    Martin's responsibilities included speaking with investors and market

analysts and, for twenty-four quarters, preparing Carter's senior management for

Carter's quarterly earnings calls through a series of earnings preparation meetings

with the Chief Executive Officer (the "CEO"), the CFO, and other senior

management.

17.    Martin's responsibilities required that he have and use material nonpublic

information on a regular basis and that he be privy to confidential top-level

discussions of the Company's financial performance, business/operations and

related issues.

18.    Martin's earnings preparation work routinely required him to identify and

anticipate key questions expected to be asked by market analysts at each quarterly earnings call.

19.    Martin's work also entailed developing the current quarter's "hot topics" for the earnings preparation meetings with members of the senior management by, among other things, talking with market analysts who followed Carter's; reviewing previous earnings call scripts; conducting regular meetings with the top executives of a number of the Company's departments, including, but not limited to finance, operations, and retail; and gathering information from their departments.

### Martin Evades Carter's Insider Trading and Preclearance Policies

20.    Over more than a two-year period (2007-2009), while employed at Carter's, Martin repeatedly traded while in possession of material nonpublic information regarding Carter's.  His trading violated Carter's insider trading policy, as well as a preclearance policy Carter's implemented with respect to officers, directors and employees like Martin who routinely had access to material nonpublic information.

21.    The insider trading policy prohibited employees from trading in the Company's securities during blackout periods surrounding earnings announcements and from trading while in possession of material nonpublic information.  The policy also outlined the types of nonpublic information that the Company deemed material including "[f]inancial information (i.e., projections of

future earnings or losses, or other earnings guidance)" and "[e]arnings that are inconsistent with consensus expectations of the investment community."

22.     The insider trading policy also defined the blackout period: "all directors, officers or other employees, and their family members, are prohibited from trading in the Company's securities during the period beginning twenty-eight calendar days prior to the close of each of the Company's fiscal quarters and fiscal year and ending after the second business day following the Company's issuance of its quarterly or annual earnings release.

23.     Carter's preclearance policy incorporated the insider trading policy by reference and stated within its first paragraph, "[t]his document describes additional procedures that apply to directors, executive officers and those non-executive employees *who regularly become aware of earnings information or other material, nonpublic information about the Company*."  (Emphasis added). The preclearance policy provided:  "No Company insider may engage in any transaction in the Company's securities . . . at any time without first obtaining preclearance of the transaction from the Chief Financial Officer."

24.     Martin signed acknowledgement forms stating that he read and understood both policies.  In fact, Martin worked with the head of Carter's Human Relations Department to develop and administer these policies, which were linked to the

Investor Relations section of the Company's intranet.

25.     Martin knew that both policies applied to him.  He also knew that he did not obtain preclearance for his repeated trades during blackout periods.

## Martin's Insider Trading While at Carter's

26.     Martin possessed financial and other material nonpublic information about Carter's on a regular basis because his job required it.

27.     From at least January 2007 through March 20, 2009 when his employment was terminated, while in possession of material nonpublic information, Martin repeatedly traded Carter's stock without preclearance during blackout periods in advance of at least eight earnings announcements.

28.     Not all of Martin's trades ultimately produced gains or avoided losses.  In some instances, the material nonpublic information Martin possessed at the time he executed his trades subsequently changed, was amended, or Martin simply miscalculated the market's reaction.

## Profitable Trading On Unambiguous News

### Trading in Advance of Carter's July 24, 2007 Announcement of Quarterly Financial Results

29.     On June 11, 2007, Martin received weekly operations materials for the Company's business segments.  These materials included a preliminary consolidated sales and margin analysis for the quarter that reflected customer

accommodations effecting sales by $552,000.  Later, a business update dated June 12, 2007 stated, among other things, that OshKosh is "underperforming at wholesale and retail" and Carter's wholesale is "not great" and retail is "sluggish." An attached second quarter P&L showed diluted EPS of $0.11, unfavorable compared to the same quarter in 2006 at $0.15.

30.    On June 12, 2007, Martin sold 21,484 shares of Carter's stock across four accounts.

31.    On July 24, 2007 during the quarterly earnings call, the Company's news was mixed.  It disclosed an adjusted second quarter EPS of $0.13, beating market consensus EPS by two cents.  Carter's also announced negative news about its diluted EPS of $2.48 stating that it included charges related to the impairment of OshKosh intangible assets as a result of continued negative trends and profitability of the OshKosh wholesale and retail segments as well as the costs related to the closure of a major distribution facility.

32.    On July 25, 2007, the first day of trading after the announcement, Carter's share price closed at $22.75, a decrease of $2.12 (8.52 percent) from its previous day's close.

### Trading in Advance of Carter's February 26, 2008
### Announcement of Quarterly Financial Results

33.    By at least January 25, 2008, Martin knew the preliminary results for the

fourth quarter 2007 because on January 25th Carter's controller sent Martin and others spreadsheets reflecting the fourth quarter preliminary results. The spreadsheets showed that the Company had "higher losses than planned (Carter's ($2.8) and OshKosh ($0.9))" and that actual EPS would only meet the market consensus EPS of $0.50.

34.     This news was viewed as negative. Carter's had a history of beating analyst targets. Out of 12 straight quarters, from the first quarter 2006 through the fourth quarter 2008, Carter's quarterly earnings results beat market consensus EPS nine times and were in line with market consensus twice.

35.     Two business days later, on Tuesday, January 29, 2008, Martin sold 5,000 shares of Carter's stock. Two days after that, Martin sold an additional 2,000 shares of Carter's stock.

36.     On February 26, 2008, after the market closed, Carter's announced that its EPS for its fourth quarter 2007, which ended December 29, 2007, was $0.45, which fell short of market consensus by $0.50. On February 27, 2008, the first day of trading after the announcement, Carter's closed at $16.88 per share, down $5.33 per share or 24 percent from its previous day's close.

### Trading in Advance of Carter's July 22, 2008 Announcement of Quarterly Financial Results

37.     By June 25, 2008, Martin knew that actual second quarter 2008 revenues

had increased over estimate by at least $5.5 million.  On June 25, 2008, Martin

received the routine revenue summary and the weekly operations materials which

he normally reviewed.  The revenue summary headline read, in pertinent part, "2nd

Quarter flash is $96.5m, compared to $91.0m in the e-1 and previous estimates of

$94.4m."

38.    Three business days later, on Monday, June 30, 2008, at 10:41 a.m., Martin

purchased 25,000 shares of Carter's stock.  Martin purchased the 25,000 shares of

Carter's stock thirteen minutes after Martin had emailed certain executives, "[w]e

had our first earnings prep session this morning. . . ."

39.    On July 22, 2008, after the market closed, Carter's announced that the EPS

for its second quarter, ending June 28, 2008, were $0.10, which beat market

consensus by $0.09.

40.    On July 23, 2008, the first day of trading after the announcement, Carter's

closed at $15.92 per share, up $0.66 per share or 4.33 percent from its previous

day's close.

### Trades in Advance of Carter's October 21, 2008
### Announcement of Quarterly Financial Results

41.    Martin's trading during September and October 2008 reflects a pattern of

buying or selling based on the positive and negative nature of the latest information

as it became available to him.

42.    Initially, the news was negative.  Martin's electronic calendar shows a

"Business Review Meeting" scheduled on September 8, 2008, from 11:00 a.m. to

5:00 p.m., and on September 9, 2009, a "Business Review Update" from 9:00 a.m.

to 2:00 p.m.  Then, at 2:22 p.m. on September 9th, Martin received Carter's Weekly

Business Update which included a recap of retail results for the week, month,

quarter, and year for, among other things, gross margins and sales revenue.

43.    The quarterly update showed that as of the week ending September 6, 2008,

revenue was approximately $83,344,100, compared to the prior year, third quarter

2007 revenue of $86,343,900, resulting in a 2.9 percent variance.

44.    An hour later, at 3:30 p.m., Martin sold 11,347 shares of Carter's stock.

45.    Then, still later, Martin sold 7,500 shares of Carter's stock and, in another

account, sold 4,000 shares.

46.    A few days later, the news swung to the positive and Martin began buying

Carter's shares.  On Friday, September 12, 2008, Martin had a scheduled Business

Update meeting from 8:00 a.m. to 10:00 a.m.  These meetings typically addressed

the financial performance of each business segment of the Company on a current

basis.  Upon information and belief, the financial information discussed at these

meetings reflected improved financial performance.

47.    At 11:58 a.m. on September 12th, Martin bought 4,000 shares of Carter's

stock.  Less than an hour later, at 12:48 p.m., Martin bought another 1,000 shares.

48.     By September 22, 2008, with four days left to the third quarter close, the CEO, CFO, and other members of the finance department would have known the preliminary third quarter results, as shown by Carter's Preliminary Review, dated as of September 22, 2008, were $0.07 above market consensus.

49.     On September 23, Martin bought 5,000 shares, and on September 23, 2008, he bought 10,000 more shares of Carter's stock.

50.     By 12:23 p.m. on October 1, Martin bought 2,800 shares of Carter's stock in two separate accounts.

51.     On October 21, 2008, after the market closed, Carter's announced that its EPS for its third quarter 2008, ended September 27, 2008, was $0.60, which beat the market consensus by $0.14.

52.     On October 22, 2008, the first day of trading after the announcement, Carter's closed at $18.74 per share, up $2.26 per share or 13.71 percent from its previous day's close.

## Unprofitable Trading

53.     On several occasions while he was employed at Carter's, Martin traded based on information that later changed, was amended or had an opposite effect on the market than Martin had anticipated.  Although this trading on material

13

nonpublic information was illegal, Martin guessed wrong as to its impact, or

changed his positions prematurely, and did not profit.

### January 2007

54.     On January 11, 2007, Martin did not avoid losses when he sold 3,700 shares

in-line with information he received during his earnings prep work and exposure to

top level discussions about accommodations (margin support provided to

wholesale customers).

55.     On January 2, 2007, Martin received the weekly operations materials and the

weekly retail business recaps which reported, among other performance indicators,

that sales were down for the week and for the quarter and that gross margin had

also decreased for the quarter.  Martin also subsequently attended an earnings prep

meeting in the second week of January.  The purpose of the meeting was to review

the year-end numbers and the forecast for the next week.

56.     On January 11, 2007, Martin sold 3,700 shares based on this apparently

negative information.  As it turned out, the Company announced a one cent

shortfall of EPS based on the cost of closing of a major distribution center and the

cost of a stock repurchase program but the market's reaction was a 3.74 percent

increase in value per share.

## October 2007

57.    In October 2007, Martin also sold on apparently negative information, but did not benefit because the stock rose when the information was made public.

58.    On October 8, 2007, during a blackout period, Martin sold 15,000 shares held in two accounts.

59.    By October 8, 2007, approximately two weeks before the earnings call, Martin's routine access would have made him aware of the preliminary results for the third quarter.  Martin would also have been aware of a planned write down of the OshKosh business because it would necessarily generate questions for his earnings prep work.  Martin received the usual daily sales and weekly business updates, operations reports and seasonal margin models throughout the week prior to his trading as he continued to prepare for the earnings call.

60.    The Company's October 23, 2007 announcement contained mixed news with EPS beating market consensus by two cents but showed a nine-month period loss due to income adjustments for impairment of intangible asset charges of approximately $154.9 million for the Company's OshKosh brand.

61.    On October 24, 2007, the first day of trading after the announcement, Carter's closed at $20.10 a share, up 8.47 percent from the previous day's close. Because the price rose, Martin's sale of stock did not avoid any losses.

### January 2009

62.    On Monday, January 5, 2009, Martin received the weekly operations report with detailed sales, marketing, and inventory and revenue information showing on a consolidated basis that 4th quarter sales were up by 85 percent compared to the sales plan for Carter's top brands.

63.    Two days later, Martin received the January 7, 2009 operations meeting materials that included the revenue summary for December 2008 and January 2009, the actual revenue for 4Q 2008, the actual margin for 4Q 2008, and an operations summary.  The revenue summary's headline read in pertinent part: "4[th] Quarter revenue was $138.8m (internal), $0.4m higher than the e-3 and our last flash."

64.    Martin purchased 12,000 shares that Friday, January 9, 2009, and bought another 12,000 shares the following Tuesday and Wednesday.

65.    Approximately two weeks later, the internal information began to turn negative.  On January 21, 2009, Martin emailed the CFO an update to his earnings prep work wherein he stated, among other things, "[t]he business update meetings are very helpful . . .  I can see tough spots we need to work through for the next earnings call but overall we will have a great story."  In reference to Carter's top retailers, Martin pointed out some "sticky" topics such as, "[m]argin decline to

continue in 2009.  Looks like we are dropping $11M in [gross margin].  This is going to take some of the zip out of great news."  Martin noted that he expected the Controller to send him the "latest cut at Q4, 2008 and 2009 so [he] can find the troubled spots to complete the key questions for our earnings call."

66.    On January 22, 2009, Martin received the earnings information from the Controller and the 4Q 2008 preliminary results from the Vice President of Finance. The preliminary Q4 2008 EPS was $0.48 compared to the fourth quarter plan of $.50 but the preliminary results beat market consensus at $0.47.

67.    Martin continued to conduct and coordinate earnings prep work meetings with the CFO and Vice President of Finance through Friday, January 23, 2009. Then, on the next two business days, January 26 and 27, 2009, Martin sold 27,000 shares and bought 3,000 shares of Carter's stock.

68.    After the market closed on February 24, 2009, Carter's announced that the EPS for its fourth quarter ending December 27, 2008 was $0.49, which beat market consensus of $0.47 by $0.02.

69.    On February 25, 2009, the first day of trading after the announcement, Carter's shares closed 10.54 percent higher than the previous day's close.

70.    Ultimately, Carter's results were viewed as a positive and the price rose, but because Martin had sold his shares when negative information came to his

attention, he did not profit.

## March 2009

71.     During March 2009, Martin's trades were in-line with the material nonpublic
information that Martin was aware of at the time he executed them, but did not
yield any profits for Martin.

72.     From March 6, 2009 through March 20, 2009, Martin bought a total of 6,000
shares of Carter's stock.

73.     Martin during that period had received repeated, positive, weekly revenue
summaries.

74.     For example, on March 11, 2009, Martin received the weekly "ops" pack
that summarized first quarter revenue:  "1Q09 is planned at $117.4M, or $2.0M
higher than the $115.4M budget."  The next morning, on March 12, 2009, Martin
purchased 1,000 shares of Carter's stock.  On March 13, he bought another 1,000
shares.

75.     On March 18, 2009, Martin received another weekly "ops" pack that
reported the same revenue summary as the previous week showing the first quarter
revenue projected at $2.0M higher than budget.

76.     Two days later, on March 20, 2009, Martin bought a total of 3,000 shares of
Carter's stock in two accounts.

77.   On April 28, 2009, after the market closed, the Company announced good news that its EPS beat market consensus EPS by a high of $0.22, but it disclosed its restructuring initiative that involved a number of operation and employment related cutbacks.

78.   On April 29, 2009, the first day of trading after the announcement, Carter's closed at $21.07 per share, down $2.13 per share (9.18 percent) from the previous day's close.  Although Martin's purchase transactions produced no gains, they were in line with the Company's good news at that time.

### Martin's Insider Trading After His Termination From Carter's

79.   After he was terminated from Carter's in March 2009, Martin continued insider trading based on material nonpublic information he received from a former coworker at Carter's.

### Trading in Advance of Carter's July 28, 2009<br>Announcement of Second Quarter Financial Results

80.   During July 2009, Martin purchased at least 36,000 shares of Carter's stock based on specific material nonpublic information from a vice president at Carter's ("Vice President").

81.   On July 20, 2009, and possibly other dates, Vice President informed Martin that Carter's expected to beat second quarter 2009 consensus EPS by a significant amount.

82.    On July 28, 2009, after the market closed, the Company announced positive

news that its EPS beat market consensus EPS by $0.17.

83.    On July 29 and 30, 2009, Martin sold more than 36,000 shares at an average

price of $27.91 per share.

### Trading in Advance of Carter's October 27, 2009
### Announcement of Delayed Third Quarter Financial Results

84.    On or about October 20, 2009, Martin received a text message from Vice

President, and they met on October 22, 2009.

85.    Vice President told Martin that Carter's would shortly announce that it

would delay its scheduled release of third quarter earnings.  Vice President also

tipped that Carter's would likely have to restate earnings for several prior periods.

86.    On October 23, 2009, Martin sold 35,615 Carter's shares on the basis of

Vice President's tip and tipped others as discussed below.

87.    On October 27, 2009, shortly after the market opened, Carter's announced

that its third quarter 2009 earnings release would be delayed based on a review of

its accounting for margin support provided to its wholesale customers.

88.    That day, Carter's closed at $21.66, down $6.78 per share (24 percent), from

the previous day's close of $28.44.

### Trading in Advance of Carter's July 28, 2010
### Announcement of Second Quarter Financial Results

89.     Between June 21, 2010 and July 10, 2010, Vice President forwarded information to Martin on Carter's earnings expectations.

90.     On or about July 7, 2010, Martin met with Vice President.  At this meeting, Vice President told Martin that Carter's expected its financial results for the second quarter of 2010 to meet consensus.  Additionally, Vice President tipped Martin that Carter's third quarter 2010 guidance was going to be significantly down due to rising costs.

91.     Based upon this information, Martin sold approximately 9,100 shares on June 22, 2010 and executed short sales of 10,200 shares on July 16, 20, and 27, 2010.

92.     On July 28, 2010, the Company announced that, while it had met consensus EPS for the quarter, its future guidance was negative.  Carter's closed at $23.96 per share, down approximately $2 from its previous day's close.

### **Martin's Tipping**

93.     By virtue of his position at Carter's, Martin developed relationships with analysts who covered Carter's stock, including a market analyst for a global financial services company ("Analyst").

94.     Analyst retired in March 2005, but maintained his relationship with Martin.

Analyst began a new career as a consultant to hedge funds.

95.    Analyst received financial and other material nonpublic information on a consistent basis from Martin and used the information to trade Carter's stock and to tip certain of Analyst's hedge fund clients.

96.    At all material times, Analyst was aware of Martin's position at Carter's and knew that Martin had an inside source at Carter's after Martin's termination.

97.    Beginning no later than 2006, Analyst and Martin spoke by telephone numerous times each quarter, close to when Analyst traded Carter's stock.

98.    In total, Analyst traded in advance of numerous quarterly earnings releases, including Carter's delayed earnings announcement on October 27, 2009, based on accurate tips that he received from Martin.

99.    By trading on material nonpublic information provided by Martin, Analyst realized gains and avoided losses for which Martin is jointly and severally liable.

### The May 10, 2005 Carter's-OshKosh Merger Agreement

100.   In early 2005, Martin learned that Carter's was engaged in confidential negotiations to acquire OshKosh.

101.   While exploration of a possible sale of OshKosh was announced to the public in or about February 2005, the identity of the buyer and the price of the transaction were not publicly announced until Carter's and OshKosh issued a joint

press release on May 10, 2005.

102.   In April or early May 2005, Martin told Analyst about the negotiations over the price of the acquisition and the maximum price per share that Carter's would be willing to pay to acquire OshKosh.

103.   Based on that information, between April 27, 2005 and May 9, 2005, Analyst executed short sales of approximately 20,500 shares of OshKosh common stock betting that the price of OshKosh stock would decline after the announcement.

104.   On or about May 10, 2005, Carter's and OshKosh issued a joint press release announcing that Carter's had agreed to acquire OshKosh at a price of $26 per share.

105.   OshKosh's stock declined by $3.66 a share at the market close the next day. Analyst's realized gains after covering his short position.

106.   On December 18, 2012, Martin pled guilty to an Indictment charging him with tipping Analyst to the above information about the OshKosh merger.

**Carter's April 24, 2007 Positive Quarterly Earnings Release**

107.   In March and April 2007, Martin learned material nonpublic information regarding Carter's earnings for the first quarter ending March 2007.

108.   Specifically, Martin learned that Carter's earnings for the quarter would

significantly exceed analysts' estimates and/or previous guidance issued by the Company.

109.   Martin communicated that information to Analyst in advance of its April 24, 2007 earnings release.

110.   Based on that information, between April 5, 2007 and April 24, 2007, Analyst purchased approximately 15,400 shares of Carter's stock and 50 call options to purchase Carter's stock.

111.   On or about April 24, 2007, Carter's announced quarterly earnings for the quarter ended March 2007.  Those earnings significantly exceeded expectations.

112.   The price of Carter's stock increased by $1.76 per share by the close of trading on April 25, 2007, generating gains for Analyst.

113.   On December 18, 2012, Martin pled guilty to an Indictment charging him with tipping Analyst to the above news about Carter's April 2007 earnings release.

### Carter's July 22, 2008 Positive Quarterly Earnings Release

114.   In or about June and July 2008, Martin learned material nonpublic information regarding Carter's earnings for the second quarter ending June 2008.

115.   The earnings release was scheduled for July 22, 2008.  Specifically, Martin learned that Carter's earnings for the quarter would significantly exceed analysts' estimates and/or previous guidance issued by the Company.

116.   From June 13, 2008 through June 17, 2008, and on July 2, 14, and 15, 2008, Analyst bought 29,000 shares of Carter's stock based on positive information from Martin.

117.   On July 22, 2008, after the market close, Carter's announced its second quarter 2008 earnings.

118.   The price of Carter's stock increased by $0.66 by the close of trading on July 23, 2008, generating gains for Analyst.

119.   On December 18, 2012, Martin pled guilty to an Indictment charging him with tipping Analyst to the above news about Carter's earnings for the second quarter of 2008.

**Third Quarter 2008 Financial Results Announced on October 21, 2008**

120.   As referenced above, by September 22, 2008, with four days left to Carter's third quarter close, the CEO, CFO, and other members of the finance department would have known the preliminary third quarter results, as shown by Carter's Preliminary Review, dated as of September 22, 2008, were $0.07 above market consensus.

121.   Also, as mentioned above, Martin traded based on this information and profited thereby.

122.   Martin also tipped Analyst to the material nonpublic information regarding

the better-than-expected earnings.

123.   On October 16, 17, 20, and 21, 2008, Analyst bought 22,800 shares of Carter's stock based on positive information from Martin.

124.   On October 21, 2008, after the market close, Carter's announced its third quarter 2008 earnings, which beat the market consensus by $0.14.

125.   The price of Carter's stock increased by $2.26 by the close of trading on October 22, 2008, generating profits for Analyst.

### Second Quarter 2009 Financial Results Announced on July 28, 2009

126.   As referenced above, on July 20, 2009, and possibly other dates, Vice President informed Martin that Carter's expected to beat second quarter 2009 consensus EPS by a significant amount.

127.   In addition to trading (and profiting), Martin tipped Analyst to that material nonpublic information.

128.   Analyst began buying shares on July 21, 2009, and continued buying between July 23, and 28, 2009, ultimately accumulating 24,000 shares.

129.   On July 28, 2009, after the market closed, Carter's announced positive news that its EPS beat market consensus EPS by $0.17.

130.   On July 29 and 31, 2009, Analyst sold 12,594 shares at an average price of $27.87 per share, and realized gains from those trades.

### Carter's Delayed Third Quarter 2009 Earnings Announcement

131.   In October 2009, after Martin's termination from Carter's, Martin told Analyst about a delay in releasing earnings for the third quarter of 2009 and a possible restatement covering several periods.

132.   On October 26, 2009, Analyst sold 15,000 shares of Carter's stock based on that negative news.

133.   On October 27, 2009, soon after the market opened, Carter's announced its delayed third quarter earnings release.

134.   The price of Carter's stock decreased by $6.78 by the close of trading on October 27, 2009, resulting in losses avoided for Analyst.

135.   In each of the instances above in which Martin tipped material nonpublic information to Analyst after Martin's termination from Carter's, Martin's source was the above-mentioned Vice President.

136.   In late 2009, Martin became a consultant to hedge funds, referred to herein as "Fund 1," "Fund 2," and "Fund 3," (collectively, the "hedge funds").

137.   The hedge funds traded Carter's stock based on the tips from Martin.

138.   Martin indicated to each hedge fund that he had a contact inside Carter's.

139.   Martin was paid consulting fees by the hedge funds and, in addition, gained a reputational benefit from his tips.

### Carter's Positive Second Quarter 2009 Financial Results

140.   On or about July 6, 2009, Martin told his contact at Fund 2 about Vice President's tip of a "big blast-out," a huge beat.

141.   On July 13, 2009, Martin continued to tip Fund 2 with Vice President's positive news in advance of Carter's second quarter 2009 earnings release.

142.   Between July 6 and 27, 2009, Fund 2 bought at least 150,796 shares of Carter's stock.

143.   On July 28, 2009, after the market closed, Carter's announced positive news that its EPS beat market consensus EPS by $0.17.

144.   During the next trading day, Carter's traded as high as $28.30 before closing at $ 27.01 per share, as compared to the previous day's close of $26.92.

145.   Fund 2 realized ill-gotten gains from the trading.

### Carter's Delayed Third Quarter 2009 Earnings

146.   As mentioned above, on or about October 20, 2009, Martin learned for the first time from Vice President that Carter's planned to announce its third quarter earnings delay and the likelihood of an earnings restatement for several periods.

147.   Consistent with Martin's practice, upon receiving Vice President's tips he immediately communicated the information to his hedge fund clients and to Analyst.

148.   Although Fund 3 apparently did not trade on Martin's tip, Fund 1 sold a total of approximately 350,000 shares of Carter's stock on October 20, 23, and 26, 2009, and Fund 2 sold 8,822 shares.

149.   On October 27, 2009, shortly after the market opened, Carter's announced that its third quarter 2009 earnings release would be delayed based on a review of its accounting for margin support provided to its wholesale customers.

150.   That day, Carter's closed at $21.66, down $6.78 per share (24 percent), from the previous day's close of $28.44.

151.   Fund 1 and Fund 2 avoided losses.

### Carter's Second Quarter 2010 Financial Results

152.   Between June 21, 2010 and July 10, 2010, Martin received negative information from Vice President about Carter's EPS and negative future guidance. Martin tipped that information to Fund 1, Fund 2, and Fund 3.  Fund 1 sold short at least one million shares of Carter's.

153.   Fund 2 sold 861,414 shares and sold short at least 267,823 shares.

154.   Fund 3 executed short sales of at least 669,932 shares of Carter's stock.

155.   On July 28, 2010, the Company announced that while it had met consensus EPS for the quarter, its future guidance was negative.

156.   Carter's closed at $23.96 per share, down approximately $2 from its

previous day's close.

157.  Accordingly, all three Funds avoided substantial losses.

158.  As a result of Martin's illicit trading described above, he avoided losses and gained profits, more than half of which resulted from his trading in the accounts of Relief Defendant, Robin Martin.  Relief Defendant Robin Martin has been unjustly enriched by the amount of those profits realized and losses avoided.

159.  Martin is jointly and severally liable for the profits gained and losses avoided by his tippees.

160.  Martin received, at least, a reputational benefit in all his instances of tipping above.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

161.  Paragraphs 1 through 160 are hereby re-alleged and are incorporated herein by reference.

162.  Between January 2007 and July 2010, Defendant, in the offer and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly employed devices, schemes, and artifices to defraud, all as more particularly described above.

163.  Defendant knowingly, intentionally, and/or recklessly engaged in the

aforementioned devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices, and courses of business.  In engaging in such conduct, Defendant acted with scienter, that is, with an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

164.   By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77a(q)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

165.   Paragraphs 1 through 161 are hereby re-alleged and are incorporated herein by reference.

166.   Between January 2007 and July 2010, Defendant, in the offer and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly

     a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; and

b.     engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

167.   By reason of the foregoing, the Defendant Martin, directly and indirectly, has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

168.   Paragraphs 1 through 161 are hereby re-alleged and are incorporated herein by reference.

169.   Between January 2007 and July 2010, Defendant, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.     employed devices, schemes, and artifices to defraud; and

b.     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

170.   Defendant knowingly, intentionally, and/or recklessly engaged in the

aforementioned devices, schemes, and artifices to defraud, and engaged in

fraudulent acts, practices, and courses of business.  In engaging in such conduct,

Defendant acted with scienter, that is, with an intent to deceive, manipulate, or

defraud or with a severely reckless disregard for the truth.

171.   By reason of the foregoing, Defendant, directly and indirectly, has violated

and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SEC respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal

Rules of Civil Procedure, finding that Defendant committed the violations alleged

herein and that the relief defendant was unjustly enriched.

### **II.**

A permanent injunction enjoining Defendant, his agents, servants,

employees, and attorneys from violating, directly or indirectly, Section 17(a) of the

Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

An order requiring the disgorgement by Defendant and Relief Defendant of all ill-gotten gains or unjust enrichment with prejudgment interest, to affect the remedial purposes of the federal securities laws.

### IV.

An order pursuant to Section 21(d)(2) of the Exchange Act imposing an officer and director bar against Defendant.

### V.

An order pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] imposing civil penalties against Defendant.

### VI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the

Commission demands trial by jury in this action of all issues so triable.


Dated:  August 27, 2013.

Respectfully submitted,

/s/ Pat Huddleston
Pat Huddleston
Senior Trial Counsel
Georgia Bar Number 373984

Counsel for Plaintiff
U.S. Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900

Atlanta, Georgia 30326-1234
(404) 842-7616
huddlestonp@sec.gov